# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BROTHERHOOD OF RAILROAD
SIGNALMEN,

    *Plaintiff*,

    v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

    *Defendant.*

Civil Action No. 17-1287 (DLF)

## MEMORANDUM OPINION

This case is a dispute between Amtrak and a union under the Railway Labor Act, which establishes two tracks for resolving labor disputes. "Major" disputes are within the jurisdiction of federal district courts, but "minor" disputes must first go to arbitration. Because this dispute is minor, the Court lacks jurisdiction and will grant Amtrak's Motion to Dismiss. Dkt. 7.

## I. BACKGROUND

The Brotherhood of Railroad Signalmen (the Union) is the designated bargaining representative for employees working in the signalman class or craft, including signalmen employed by the National Railroad Passenger Corporation, known as Amtrak. Compl. ¶¶ 1–2, Dkt. 1. Union signalmen install and maintain Amtrak's railroad signal and communications systems and equipment. *Id.* ¶ 5. The Union and Amtrak have a collective bargaining agreement that establishes the rates of pay, rules, and working conditions for signalmen employed by Amtrak. *See id.* ¶ 6; Collective Bargaining Agreement (Agreement), Dkt. 7-3; *see also* Jindal Decl. ¶ 3, Dkt. 7-2.

Rule 7 of the collective bargaining agreement divides Amtrak lines and facilities into districts. Compl. ¶ 6. Relevant here, Southern Seniority District 3 is the "Chesapeake Division"; it covers the Amtrak lines and facilities from Darby, Pennsylvania to the southern limits of the Washington Terminal in Washington, D.C. *See* Agreement Rule 7, Dkt. 7-3 at 6. Notably, the collective bargaining agreement has not always covered the Washington Terminal, which was owned by the Washington Terminal Company until the early 1980s. Jindal Decl. ¶ 7. When Amtrak acquired the Washington Terminal in the early 1980s, Amtrak and the Union supplemented their collective bargaining agreement to cover signalmen work at the Terminal. *Id.* In 1984, they added Appendix B-11, which states:

> In view of the transaction which will result in the assumption by Amtrak of the Communication and Signal work formerly performed by employees of the Washington Terminal Company, the parties agree to the following . . .
>
> Seniority District No. 3 – Chesapeake Division as described in the [collective bargaining agreement] is modified to include the former Washington Terminal Company property within that seniority district . . . .

Agreement App. B-11, Dkt. 7-3 at 11.

Rule 1 of the collective bargaining agreement—the scope rule—describes the scope of work that accrues to the Union. As to covered districts like the Chesapeake Division, the scope rule provides:

> These Rules, subject to the exceptions hereinafter set forth, shall constitute Agreements between Amtrak and its Communication and Signal Department employees of the classification herein set [forth] engaged in the installation and maintenance of all signals, interlockings, telegraph and telephone lines and equipment including telegraph and telephone office equipment, wayside or office equipment of communicating systems (not including such equipment), highway crossing protection (excluding highway crossing gates not operated in conjunction with track or signal circuits) including repair and adjustment of telegraph, telephone and signal relays and the wiring of telegraph, telephone and signal instrument cases, and the maintenance of car retarder systems, and all other work in connection with

2

> installation and maintenance thereof that has generally been recognized as telegraph, telephone or signal work—represented by the Brotherhood of Railroad Signalmen and shall govern the hours of service, working conditions and rates of pay of the respective positions and employees of Amtrak, specified in Rule 2 hereof, namely Electronic Specialists, Electronic Technicians, Inspectors, Assistant Inspectors, Foremen, Assistant Foremen, C&S Maintainers, Maintainers, Signalmen, Assistant Signalmen, Trainees and Helpers.
>
> The employees in the Communication and Signal Department shall continue to install, maintain and repair, and do testing incident thereto, of all devices and apparatus . . . which are part of the signal or telegraph and telephone systems, to the extent that such work is now being performed by employees of the Communication and Signal Department. This paragraph shall not, however, prejudice any rights which such employees may have under the Scope Rule, exclusive of this modification, to claim work performed by other crafts in violation of the Scope Rule.

Agreement Rule 1, Dkt. 7-3 at 3; *see also* Compl. ¶ 7.

The scope rule also contemplates that Amtrak may contract out "scope work" in certain circumstances:

> Amtrak may not contract out work normally performed by an employee in a bargaining unit covered by a contract between a labor organization and Amtrak or a rail carrier that provided intercity rail passenger transportation on October 30, 1970, if contracting out results in the layoff of an employee in a bargaining unit.

Agreement Rule 1, Dkt. 7-3 at 5.

This dispute concerns whether the collective bargaining agreement requires Amtrak to assign work in the Railway Express Agency (REA) Building to Union-represented signalmen. The REA Building, outlined in red below, is located at 900 Second Street Northeast, Washington, D.C., adjacent to Union Station. *See* Graber Decl. ¶ 2, Dkt. 7-15.

3



*See* District of Columbia Geographic Information System, Real Property Finder, http://dcgis.maps.arcgis.com/apps/webappviewer/index.html?id=3ca919beca684ea7bd7d1ced0dbbf636. From 1989 to 2015, Amtrak leased space in the REA Building, most recently from a company called Fluorine, LLC. *See* Graber Decl. ¶ 2. In connection with plans to expand Union Station, Amtrak acquired ownership of the REA Building through eminent domain and took possession of the building on October 1, 2015. *Id.*

On January 31, 2017, Union Chairman David Ingersoll asked Amtrak whether their collective bargaining agreement required Amtrak to assign the signalmen work in the REA

Building to the Union. *See* Compl. ¶ 10; Dkt. 7-11 at 4. After some back-and-forth, Amtrak responded that signalmen work in the REA Building is not within the scope of the collective bargaining agreement. *See* Compl. ¶¶ 12–20; Dkt. 7-11 at 2–3. Meanwhile, on March 21, 2017, Amtrak notified the Union that Amtrak intended to contract out the renovation of the REA Building, including signalmen work. *See* Dkt. 7-12.

On June 30, 2017, the Union filed its complaint, which alleges that Amtrak violated the collective bargaining agreement and thus the Railway Labor Act by (i) not acknowledging that signalmen work in the REA building accrues to the Union and (ii) not assigning signalmen work in the REA Building to the Union. Compl. ¶¶ 21–27. Amtrak moved to dismiss on July 27, 2017, *see* Dkt. 7, and the case was reassigned to the undersigned judge on December 4, 2017.

## II. LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss an action when the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). "When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks and citation omitted). Those factual allegations, however, receive "closer scrutiny" than they would in the Rule 12(b)(6) context. *Id.* Also, unlike when evaluating a Rule 12(b)(6) motion, a court may consider materials outside the pleadings to evaluate whether it has jurisdiction, *see Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), such as the complaint supplemented by undisputed facts in the record, *see Herbert v. Nat'l Acad.*

5

*of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Without jurisdiction, the court must dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III. ANALYSIS

### A.  Jurisdiction for Railroad Labor Disputes

The Railway Labor Act governs the jurisdiction of federal district courts over certain railroad labor disputes. *See* 45 U.S.C. § 151 *et seq.* District courts have jurisdiction over "major" disputes. *Bhd. of Maint. of Way Emps. Div. v. Nat'l R.R. Passenger Corp.* (*BMWED*), 217 F. Supp. 3d 249, 255 (D.D.C. 2016) (citing *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989)). But for "minor" disputes, "the district courts have only limited review *after* . . . an arbitral decision." *Id.* (emphasis added) (citing *Consol. Rail Corp.*, 491 U.S. at 302–04); *see* 45 U.S.C. § 153 First (q) (providing for limited review of the arbitral decision); *accord Nat'l R.R. Passenger Corp. v. Fraternal Order of Police*, 855 F.3d 335, 338 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 979 (2018).

Jurisdiction thus hinges on whether a dispute is major or minor. "[M]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am.*, 373 F.3d 121, 124 (D.C. Cir. 2004) (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994)). In other words, major disputes "concern the creation of contractual rights," while minor disputes "concern the interpretation of contractual rights." *BMWED*, 217 F. Supp. 3d at 256. To classify a dispute, "courts look beyond the complaint to the arguments of the party asserting a contractual basis for the disputed action." *Id.* "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is

6

major." *Consol. Rail Corp.*, 491 U.S. at 307 (emphasis added). "These locutions are essentially the same in their result. They illustrate the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the [Railway Labor Act]." *Id.* at 306–07 (internal quotation marks omitted). Thus, "although the plaintiff has the burden of establishing subject-matter jurisdiction with facts showing jurisdiction, the employer also bears a relatively light burden in persuading the court that the action is arguably justified by the contract in light of the facts." *BMWED*, 217 F. Supp. 3d at 256 (internal quotation marks and alteration omitted). Further, "there is a strong presumption in favor of finding a dispute to be minor," *id.* (internal quotation marks), and "if doubt arises about the classification of a dispute, the dispute is . . . considered to be minor," *id.* (alteration omitted) (quoting *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001)).

When assessing a collective bargaining agreement, a court does not use the common-law concepts that govern private contracts because a collective bargaining agreement "is not an ordinary contract," but rather "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Consol. Rail Corp.*, 491 U.S. at 311 (quoting *Transp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)). Therefore, the court applies "the common law of a particular industry or of a particular plant" by examining the "whole employment relationship." *Id.* at 312. "[C]ollective-bargaining agreements may include implied, as well as express, terms," and "the parties' practice, usage and custom is of significance in interpreting their agreement." *Id.* A term "cannot be implied based on prior isolated 'occurrences of similar conduct,'" but can be implied from conduct "understood by the parties to at least impliedly serve as if part of the collective bargaining agreement." *BMWED*,

7

217 F. Supp. 3d at 257 (quoting *United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220, 222 (8th Cir. 1970)).

## B. The Dispute Between Amtrak and the Union

This dispute is minor because Amtrak's actions are "arguably justified" by the terms of the collective bargaining agreement in at least three ways. *Consol. Rail Corp.*, 491 U.S. at 307.

First, the scope rule arguably protects existing Union work in the Chesapeake Division, but does not mandate that new work in the REA Building automatically accrues to the Union. Per the scope rule, Union-represented employees "shall *continue* to install, maintain and repair . . . all devices and apparatus . . . which are part of the signal or telegraph or telephone systems, *to the extent that such work is now being performed* by [Union-represented employees]." Agreement Rule 1, Dkt. 7-3 at 3 (emphasis added). According to the Union's reading of this language, the scope rule governs the "types of work" reserved for the Union, not the locations where such work is performed, so the Union merits the same types of work at the newly acquired REA Building. *See* Opp'n at 26–27, Dkt. 10. But the language of the collective bargaining agreement does not clearly mandate that interpretation.[1] Rather, it is plausible that the scope rule guarantees to the Union all existing work at the time of the agreement, but not new work in new locations, such as signalmen work in the newly acquired REA Building. That is how another judge of this Court read a very similar scope rule that guaranteed to a train-services union the "work presently recognized as the exclusive work of passenger train service employees on main

---

[1] Moreover, the Union's theory of the case undercuts its interpretation. The Union alleges that the work in the REA Building accrued to the Union when Amtrak acquired the Building in 2015. *See* Compl. ¶ 19. From 1989 to 2015, however, Amtrak leased space in the REA Building. *See* Graber Decl. ¶ 2, Dkt. 7-15 at 1. If the scope rule merely governs the type of work performed by the Union, not its location, then the Union has deserved the signalmen work in the REA Building for decades and not—as the Union argues—simply since the 2015 change in ownership of the REA Building.

lines, or branch lines or within yard facilities." *Nat'l R.R. Passenger Corp. v. United Transp. Union*, 832 F. Supp. 7, 9 (D.D.C. 1993). As in that case, the scope rule here "does not specifically identify the work that belongs exclusively to the [Union], but rather identifies it by reference to work recognized as the exclusive work of the [Union] as of [the date of the agreement]." *Id.* at 11. Because the dispute thus "relates to the interpretation and application of an existing agreement" and Amtrak presents a justifiable interpretation, "Amtrak's reliance on [the scope rule] to support . . . its actions can hardly be said to be 'obviously insubstantial.'" *Id.* (quoting *Consol. Rail Corp.,* 491 U.S. at 307).

Second, Appendix B-11 does not necessarily bring the REA Building's signalmen work within the scope of the collective bargaining agreement. The Appendix states that the "Chesapeake Division . . . is modified to include the former Washington Terminal Company property within that seniority district." Agreement App. B-11, Dkt. 7-3 at 11. The Union argues that Appendix B-11 must encompass the REA Building because the Building "was always part of the Washington Terminal" and qualifies under Appendix B-11 as "former Washington Terminal property." *See* Opp'n at 25.[2] But when the parties added Appendix B-11 to the collective bargaining agreement in 1984, the Washington Terminal Company did *not* own the REA Building, having sold it to Mount Claire Properties in 1981. Graber Decl. ¶ 3; *see also* Dkt. 7-17 (deed transferring the REA Building in 1981). Thus, it is arguable that the REA Building does not qualify as "former Washington Terminal Company property" and Appendix B-11 does not bring the REA Building within the scope of the collective bargaining agreement.

---

[2] The Union misquotes Appendix B-11, which modifies the collective bargaining agreement to include "former Washington Terminal *Company* property." Dkt. 7-3 at 11 (emphasis added). Correctly quoted, the phrase undercuts the Union's contention that Appendix B-11 "applies to the Washington Terminal" generally, not the specific property owned by the Washington Terminal Company circa 1984. *See* Opp'n at 24–26.

9

Third, even if the scope rule covers new work in the REA Building, the rule does not necessarily guarantee that new work to the Union. The scope rule arguably permits Amtrak to hire contractors to perform scope work as long as Union-represented employees are not laid off as a result. *See* Agreement Rule 1, Dkt. 7-3 at 5 ("Amtrak may not contract out work normally performed by an employee in a bargaining unit covered by a contract between a labor organization and Amtrak . . . if contracting out results in the layoff of an employee in a bargaining unit."). Amtrak, through its Director of Labor Relations, represents that "[n]o Amtrak forces will be furloughed, as a result of this contracting of work." Jindal Decl. ¶ 22; *see also* Letter from Jindal to Ingersoll (Mar. 21, 2017), Dkt. 7-12 at 3 (same). The scope rule thus plausibly permits Amtrak to contract out work in the REA Building. In these ways, the terms of the collective bargaining agreement arguably justify Amtrak's actions, making this a minor dispute.

Were that not enough, the parties' "practice, usage and custom" confirms that the scope rule does not automatically capture new work gained through an Amtrak acquisition. *See Consol. Rail Corp.*, 491 U.S. at 311. When Amtrak acquired new property in the past, Amtrak negotiated with the Union to amend the collective bargaining agreement and bring new work within its scope. Most relevant here, when Amtrak acquired the former Washington Terminal Company property in the 1980s, the parties negotiated and amended the collective bargaining agreement via Appendix B-11, which added the Washington Terminal Company property to the Chesapeake Division. *See* Jindal Decl. ¶ 7; Agreement App. B-11, Dkt. 7-3 at 11. More recently, in 2012 when the Michigan Department of Transportation contracted with Amtrak for maintenance work in certain Michigan territory, Amtrak and the Union executed a Memorandum of Agreement to confirm that the collective bargaining agreement covered the work and territory.

10

*See* Woodcock Decl. ¶ 2, Dkt. 7-13; Memorandum of Agreement, Dkt. 7-14. Although isolated examples may not necessarily demonstrate an established prior practice, *see BMWED*, 217 F. Supp. 3d at 257, this case involves relatively rare circumstances: acquiring new facilities. Such circumstances "might well be so rare an occurrence that one instance would be enough" to establish a past practice, *Maine Cent. R. Co. v. United Transp. Union*, 787 F.2d 780, 783 (1st Cir. 1986), particularly when the Union has not presented any countervailing examples, *see* Opp'n at 32; Def.'s Reply at 12 n.4, Dkt. 11.

Past practice also indicates that Amtrak can contract out work covered by the scope rule as long as that decision does not lead to layoffs for Union-represented employees. Since 1999, Amtrak has contracted out scope work at least 62 times via the "Labor Clearance Process." *See* Jindal Decl. ¶¶ 13–14; *see also* Dkt. 7-6 at 13 (Union President W. Dan Pickett testifying to the Presidential Emergency Board that Amtrak had "subcontracted no fewer than 27 Job Labor Clearances (outsourced projects) that fall within the Scope of the [Union] agreements without penalty from the Union"); Dkt. 7-7 at 2–3 (listing 27 signalmen projects outsourced from 1999 to June 2007); Dkt. 7-8 (35 signalmen projects outsourced from October 2007 to present). Amtrak followed the same process here. *See* Jindal Decl. ¶ 22. Given the parties' past practice, Amtrak's decision is not "frivolous or obviously insubstantial." *Consol. Rail Corp.*, 491 U.S. at 307.

The Court takes no position on which party offers the better interpretation of the collective bargaining agreement. *See id.* at 320 ("[I]n no way do we suggest that Conrail is or is not entitled to prevail before the Board on the merits of the dispute."); *BMWED*, 217 F. Supp. 3d at 258 ("[I]t is not for the Court to say whether the CBAs permit [Amtrak's action]."). Instead, the Court determines only that Amtrak "has met the light burden" of showing that the collective

11

bargaining agreement arguably justifies Amtrak's actions. *Consol. Rail Corp.*, 491 U.S. at 320. This case is therefore a minor dispute over which the Court lacks jurisdiction. *See id.* at 307. The Court will dismiss the action. *See* Fed. R. Civ. P. 12(b)(1), (h)(3).

## CONCLUSION

For the foregoing reasons, the Court grants Amtrak's Motion to Dismiss. Dkt. 7. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: May 18, 2018